[No. H035417. Sixth Dist. Nov. 9, 2010.]

In re BAILEY J., a Person Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND
CHILDREN'S SERVICES, Plaintiff and Respondent, v.
PATRICIA J., Defendant and Appellant;
ANGELINA J., Appellant.

## COUNSEL

Janet G. Sherwood, under appointment by the Court of Appeal, for Appellant.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

Miguel Marquez, County Counsel, and Susan S. Ware, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**MIHARA, J.**—Appellants Patricia J. (the mother) and Angelina J. challenge the juvenile court's termination of the mother's parental rights to her son Bailey J., Angelina's half sibling, and the court's selection of adoption as Bailey's permanent plan. The mother contends that the juvenile court erred in failing to apply the parental relationship exception to adoption and/or the sibling relationship exception to adoption. Angelina maintains that the juvenile court prejudicially erred in refusing to accord her status as a party at the Welfare and Institutions Code section 366.26[1] hearing and in failing to apply the sibling relationship exception to adoption. We reject their contentions and affirm the juvenile court's order.

### I. Background

In 2004, long before Bailey was born, two of Bailey's siblings, one of whom was one year old and the other of whom was one month old, and two of his half siblings, six-year-old Angelina and her eight-year-old half brother, were removed from the custody of the mother and the father. Bailey's two siblings had suffered multiple bone fractures as infants, and the parents were found to have physically abused them. The mother and the father failed to reunify with the two siblings despite 18 months of reunification services, and these two siblings were adopted by their maternal grandmother. Angelina and the other half sibling were placed with their respective fathers. In 2006, a third sibling was detained shortly after her birth. Both parents relinquished their parental rights to this child, and she too was adopted by the maternal grandmother. In January 2008, Angelina was placed in protective custody because her father had sexually molested her. The mother was granted reunification services. Angelina was placed in a foster home.

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

Bailey was born in April 2008. He was detained two days after his birth due to his parents' prior history of abuse and neglect of his siblings and half siblings. On April 15, 2008, Bailey was placed in the same foster home as Angelina. However, "a very short time later," Angelina was removed from this placement due to her "behavioral and emotional difficulties." Angelina was placed in a community care facility. Bailey has remained in the same foster home throughout the dependency proceedings. His foster mother wishes to adopt him and is committed to providing him with a permanent home. The court granted the foster mother's request for de facto parent status.

A petition was filed under section 300, subdivisions (b) and (j) seeking jurisdiction over Bailey. After a very lengthy contested jurisdictional hearing, the court took jurisdiction over Bailey and removed Bailey from his parents' custody. Although the Santa Clara County Department of Family and Children's Services (the Department) sought a bypass of reunification services, the court granted reunification services to both parents. The court also ordered that the parents have weekly supervised visitation with Bailey.

Initially, the parents visited Bailey for two 2-hour supervised visits each week. Reunification services were continued at the six-month review hearing in March 2009. In May 2009, the visits were changed to one 8-hour visit each week supervised by the mother's stepfather. The mother and the father separated in June 2009, and the father ceased visiting Bailey. The mother's visits with Bailey supervised by the stepfather went well. The stepfather thought that they "interact like a mother and child."

The mother's reunification services for Angelina were terminated in July 2009. However, Angelina was present at some of the mother's visits with Bailey under the stepfather's supervision. When Bailey's youngest sibling (born in 2006) was present during Bailey's visits with the mother, Bailey "attempt[ed] to talk more."

At the contested 12-month review hearing in September 2009, the Department recommended that the parents' reunification services be terminated as to Bailey. The court terminated reunification services for both the mother and the father as to Bailey and set a section 366.26 hearing for January 21, 2010. Visitation was continued for both parents, with each receiving one 8-hour supervised visit per week. The court also ordered monthly supervised sibling visitation for two hours. Angelina was returned to the mother's custody in December 2009 with family maintenance services.

In January 2010, the court referred the parties to mediation and reset the section 366.26 hearing for February 18, 2010. The mediation was unsuccessful. On February 18, the attorney who was jointly representing Bailey and

Angelina declared a conflict. On February 22, that attorney was relieved, and new separate attorneys were appointed to represent Bailey and Angelina. The section 366.26 hearing was continued to March 5. On March 5, the mother's attorney made an oral Code of Civil Procedure section 170.6 challenge to the judge. The judge allowed the challenge, and the matter was continued for a contested section 366.26 hearing on March 24 before a different judge.

The Department's section 366.26 report recommended that parental rights be terminated and adoption selected as Bailey's permanent plan. The report noted that Bailey is a "well adjusted and cheerful young child" who has "a healthy and loving bond with his caregiver" from whom he seeks "comfort, attention, and approval." The report stated, without explanation, "[t]his will be a closed adoption." The Department acknowledged that the mother had maintained regular and appropriate visitation with Bailey. Bailey had also had bimonthly visits with his maternal grandmother and the siblings she had adopted. The report did not mention Bailey's relationship with Angelina.

The section 366.26 hearing was held on March 24, 2010. Angelina was present at the hearing along with her appointed attorney. The Department submitted on the section 366.26 report. None of the attorneys chose to question the social worker. Although the mother's attorney tried to call Angelina to testify as the mother's first witness, Angelina was reluctant to testify. Instead, the mother testified as the first witness, and Angelina's attorney thereafter read to the court a statement from Angelina, which was accepted by all as an offer of proof. The Department's attorney argued that neither the mother nor Angelina had met the burden of establishing an exception to adoption. Bailey's attorney argued that neither exception had been established and that adoption was in Bailey's best interest, and she sought termination of parental rights.

The court noted that "the reports indicate it would be a closed adoption, which definitely heightens . . . the weight of what the court must decide." The court found that the mother had maintained regular visitation, but it observed that those visits had always been supervised. "I don't believe there's been a demonstration that this is [a] type of relationship that the child would benefit from in continuing the relationship with [the mother]." The court found both the parental relationship exception and the sibling relationship exception inapplicable. The court explicitly found that "it's in Bailey's best interest to free him for adoption." The court terminated parental rights and selected adoption as Bailey's permanent plan.[2] Both the mother and Angelina timely filed notices of appeal.

---

[2] The father agreed to adoption as Bailey's permanent plan.

## II. Discussion

■ Adoption must be selected as the permanent plan for an adoptable child and parental rights terminated unless the court finds "a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. [¶] . . . [¶] (v) There would be substantial interference with a child's sibling relationship . . . ." (§ 366.26, subd. (c)(1)(B).) "[T]he burden is on the party seeking to establish the existence of one of the section 366.26, subdivision (c)(1) exceptions to produce that evidence." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 252 [127 Cal.Rptr.2d 876].)

There is some dispute about the precise standard of review that applies to an appellate challenge to a juvenile court ruling rejecting a claim that one of the adoption exceptions applies. In *In re Jasmine D.* (2000) 78 Cal.App.4th 1339 [93 Cal.Rptr.2d 644] (*Jasmine*), the First District Court of Appeal acknowledged that most courts had applied the substantial evidence standard of review to this determination. (*Jasmine*, at p. 1351.) However, the First District concluded that the abuse of discretion standard of review was "a better fit" because the juvenile court was obligated to make "a quintessentially discretionary determination." (*Jasmine*, at p. 1351; but see *Pack v. Kings County Human Services Agency* (2001) 89 Cal.App.4th 821, 839–840 [107 Cal.Rptr.2d 594] [disagreeing with *Jasmine*'s standard of review choice but not in the context of a challenge to a ruling on an exception to adoption].)

■ In our view, both standards of review come into play in evaluating a challenge to a juvenile court's determination as to whether the parental or sibling relationship exception to adoption applies in a particular case. Since the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental or sibling relationship, which is a factual issue, the substantial evidence standard of review is the appropriate one to apply to this component of the juvenile court's determination. Thus, as this court noted in *In re I.W.* (2009) 180 Cal.App.4th 1517 [103 Cal.Rptr.3d 538], a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the "undisputed facts lead to only one conclusion." (*In re I.W.*, at p. 1529.) Unless the undisputed facts established the existence of a beneficial parental or sibling relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed.

The same is not true as to the other component of these adoption exceptions. The other component of both the parental relationship exception and the sibling relationship exception is the requirement that the juvenile court find that the existence of that relationship constitutes a *"compelling reason* for determining that termination would be detrimental." (§ 366.26, subd. (c)(1)(B), italics added.) A juvenile court finding that the relationship is a "compelling reason" for finding detriment to the child is *based* on the facts but is not primarily a factual issue. It is, instead, a "quintessentially" discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 951 [124 Cal.Rptr.2d 688].) Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies.

## A. Parental Relationship Exception

The mother contends that she established that she "occupied a parental role in Bailey's life and that termination of parental rights would be detrimental to him." The Department argues that, while it is undisputed that the mother regularly visited with Bailey, she did not fill a parental role in his life and any benefit from her relationship with him was outweighed by the benefit to him of a permanent adoptive home. It contends that the juvenile court did not err in concluding that the mother's relationship with Bailey was not a compelling reason for finding that its severance would be detrimental to Bailey.

"The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467 [118 Cal.Rptr.2d 482], fn. omitted.) "Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535] (*Autumn H.*).) Evidence of "frequent and loving contact" is not sufficient to establish the existence of a

beneficial parental relationship. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418 [35 Cal.Rptr.2d 162].)

The mother testified that she regularly visited Bailey once a week for eight hours, usually on Saturdays at her stepfather's home.[3] They would have breakfast, run errands, play in the yard, watch movies, and do the laundry. Bailey would be "real excited" to see her and would call her "mommy." During visits, the mother would take responsibility for changing Bailey's diapers and feeding him. The mother asserted that Bailey looked to her for "comfort" and in "times of stress" during their visits. The mother believed that she and Bailey had "a strong parental bond." She thought Bailey would suffer detriment if she were no longer a part of his life because she was the one who would be able to tell him about his family and his heritage.

■ This evidence did not establish that the relationship between the mother and Bailey was a beneficial parental relationship. As Bailey was detained when he was two days old, he spent no part of his life in the mother's custody. Her entire relationship with Bailey was established through supervised weekly visits. His foster mother, with whom he has been placed for his entire life, is his de facto parent, and she is the person who has provided for his "physical care, nourishment, comfort, affection and stimulation." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) At best, mother's supervised interactions with Bailey amounted to little more than playdates for him with a loving adult. Their frequent and loving contact was insufficient to show the requisite beneficial parental relationship. For instance, the mother produced no evidence that Bailey looked forward to visits with her or had difficulty separating from her at the end of their visits. While there was no evidence that the visits themselves were detrimental to Bailey, there was also no evidence that Bailey benefitted from these visits. The undisputed evidence did not establish that the mother had a beneficial parental relationship with Bailey.

Even if the mother had established the existence of a beneficial parental relationship, she cannot show that the juvenile court abused its discretion in finding that the relationship between the mother and Bailey did not constitute a "compelling reason" for finding that adoption would be detrimental to

---

[3] The mother's testimony about the visits apparently referred only to her visits between May 2009 and March 2010, as her previous visits were two-hour visits twice a week, which were not at her stepfather's home. The mother also relies on evidence that she breastfed Bailey during her weekly visits from April to July 2008. Evidence that the mother breastfed Bailey when he was one to three months old did not establish that her subsequent relationship with him was beneficial to him.

Bailey. The mother asserts that it would be detrimental to Bailey to terminate their relationship because she was the only person who could inform him of his heritage and family. However, the juvenile court could reasonably conclude that the absence of this information was not a "compelling reason" for rejecting adoption. The mother's relationship with Bailey was based solely on supervised visits with a child who had never been in her custody and who had been continuously in the custody of the foster mother for his entire life. The juvenile court could reasonably conclude that the absence of the mother from his life would result in no significant detriment to Bailey and therefore was not a compelling reason for rejecting adoption.

### B. Sibling Relationship Exception

Both the mother and Angelina contend that the juvenile court erred in failing to apply the sibling relationship exception to adoption.

■ The sibling relationship exception applies where the juvenile court finds that "substantial interference with a child's sibling relationship" is a "compelling reason" to conclude that adoption would be detrimental to the child. In making this determination, the court should take into consideration "the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

Bailey has two groups of siblings: three biological siblings and two biological half siblings. His three biological siblings have all been adopted by the maternal grandmother. Bailey has never lived with any of these three siblings, and there was no evidence that he has shared any significant common experiences with them or has a strong bond to any of them. The record contains little evidence regarding Bailey's contact with these siblings. The section 366.26 report states: "Historically, Bailey has had bi-monthly visits with his maternal grandmother and [these three siblings]. Since November of 2009, visits between Bailey and his maternal grandmother have occurred twice a month." These visits were unsupervised. The foster mother reported that Bailey "has a difficult time" when he is dropped off for these visits and "cries and does not want to go . . . ."[4] The mother testified only

---

[4] She reported that Bailey did not exhibit reluctance when the stepgrandfather picked him up for his visit with the mother.

that some of Bailey's siblings were present "from time to time" at her visits. This evidence establishes only that Bailey had contact with these siblings, but it fails to demonstrate the nature of his relationship to them. The paucity of this evidence readily demonstrates that the juvenile court was not obligated to find that Bailey had a significant relationship with any of these three siblings.

Bailey's biological half siblings were Angelina and her half brother. There was no evidence that Bailey had ever even met the half brother. Angelina and Bailey had been placed together in the care of the foster mother for "a very short time" before Angelina was removed from the home. Angelina's only other contact with Bailey occurred through her presence at "[a] majority of the visits" between the mother and Bailey from May 2009 to December 2009. The mother testified that, during visits, Bailey would take Angelina's hand and "try to figure out which toys he can go with and which toys she would let him play with." When the mother was busy during a visit, Bailey would seek out Angelina, his eldest female sibling, as a source of "comfort" and "[d]uring times of stress." Angelina's statement to the court reflected her belief that Bailey would miss her and the mother if their relationship was terminated.

While this evidence established that there was a relationship between Angelina and Bailey, it did not indisputably establish that Bailey had a closely bonded sibling relationship with Angelina. He lived with her for a very short period of time when he was a newborn infant. There was no evidence that he saw her again for over a year. Thereafter, his contact with her was limited to her presence at some of the mother's weekly visits over a period of less than eight months. Although it is clear that Angelina treasured Bailey, the evidence did not establish that Bailey's attachment to Angelina was equally strong. Since the undisputed evidence did not compel a finding that Angelina and Bailey had a sibling relationship that was *beneficial to Bailey*, the juvenile court's finding that the sibling relationship exception to adoption did not apply was supported by substantial evidence.

Furthermore, the juvenile court did not abuse its discretion in concluding that the relationship between Angelina and Bailey did not constitute a compelling reason for finding adoption to be detrimental to Bailey. Angelina believed that Bailey would miss her if he was adopted, but the juvenile court could have concluded that Angelina's belief was unfounded and any possible detriment to Bailey was outweighed by the benefit that he would gain by being adopted by the foster mother, who had cared for him continuously for his entire life.

## C. Court's Refusal to Grant Angelina Party Status

Angelina contends that the juvenile court prejudicially erred in refusing to grant her party status at the section 366.26 hearing.

### 1. Background

Angelina was present at the section 366.26 hearing along with her appointed attorney. At the outset of the hearing, the court asked Angelina's attorney to "explain the nature of what your appearance is for?" Angelina's attorney explained: "I'm here with my client, Angelina. We have a position, her position in this case. We have some testimony from Angelina and I'll be here to ask her some questions and we'll be present in the courtroom." The Department's attorney objected to Angelina's attorney being "seated at counsel table." Angelina's attorney asserted that "Angelina is a party" because "they share a sibling bond and anything that happens to Bailey does affect Angelina."

The court asked Angelina's attorney if she had "any authority to assist me in determining whether or not your client is a party." She responded "No." Bailey's attorney and the mother's attorney agreed that Angelina should be treated as a party, but neither of them could cite any authority for this position. The attorneys for the Department and the foster mother opposed treating Angelina as a party, but neither of them could cite any authority for their position. The attorney for the father did not believe that Angelina was a party, but he thought it made no difference since the court should in any case hear evidence about Angelina's relationship with Bailey.

The court expressed the view that Angelina was not a party and that her attorney should not sit at counsel table except during Angelina's testimony. "Then, after testimony, it's my understanding your client is not a party, it seems more appropriate for you to sit in the back with your client, if there's any objection from a party. You had wanted to, you stated off the record, sit at counsel table because you had intended to question all of the other witnesses during the trial. I asked you your authority for that, again, related to a party. I'm not sure whether it's appropriate for a non-party to ask any questions. [¶] I said off-the-record that Angelina is placed with her mother and you can sit next to [the mother's attorney] and there's a chair right by him and if you feel there's [*sic*] questions that needs [*sic*] to be asked, if he feels it necessary, I'm happy to go off-the-record and give you time to confer. And if you want to take a break and ask someone to start looking for authority and you want to revisit that issue during the course of the trial, I'm

happy to do that as well, if you would like to make a phone call or something like that. Let me know where you stand on this." Angelina's attorney responded: "We want to offer some testimony." The court said: "You're okay sitting in the back by [the mother's attorney], if you need to have questions asked that way."

The court inquired of the attorneys and learned that the only expected witnesses at the hearing were Angelina and the mother.[5] The Department submitted the matter on the section 366.26 report. None of the attorneys, including the mother's attorney, wished to question the social worker. The court asked Angelina's attorney if she wished "to confer with any attorney about whether or not there should be questioning of the social worker." She declined. The mother's attorney then called Angelina as her first witness. The court asked Angelina's attorney "where she feels more comfortable being seated" and asked her to check with Angelina. The court then said "I can't help but notice there's something going on." It asked Angelina's attorney: "Would you like us to either clear the courtroom or would you like to step outside so you can have some private time with your client?" The court explained: "And she can either sit at counsel table with her CASA or if she decides to sit at the witness stand, we can bring in an extra chair for her CASA.[6] You can make an offer of proof, and we might want to check in with the lawyers and the parties if they would object to that. Why don't you take a moment. It may be a bit more helpful for you." Angelina's attorney said: "We can go in the hallway."

After an off-the-record discussion, Angelina's attorney stated: "Angelina is having some difficulty. She does not wish to testify anymore. I would like to make an offer of proof as to her testimony." The other attorneys agreed that a written offer of proof would be acceptable. Angelina's attorney noted that, in advance of the hearing, she had tried to persuade Angelina to write a letter to the court, but Angelina had insisted on "talking to you." The court responded: "I have a suggestion. . . . And since you aren't a party or necessarily a party and you're not going to be able to question, and we do have a witness who is going to testify, it may be worthwhile to go outside in your office in the hallway, work with your client on a written offer of proof for yourself or a letter you can Xerox, provide copies to counsel so they can have an

---

[5] The mother's attorney also stated that he intended to call "Ms. W[.]" to testify. There is no indication that a "Ms. W[.]" was present at the hearing, and the mother's attorney did not call anyone to testify other than Angelina and the mother. None of the other attorneys sought to call any witnesses to testify at the hearing.

[6] "CASA" stands for court-appointed special advocate, the person who assists the court in serving a dependent child's best interests. (*In re Samuel G.* (2009) 174 Cal.App.4th 502, 507 & fn. 2 [94 Cal.Rptr.3d 237].)

opportunity to look at it." "If that doesn't work for you, I can give everyone ten minutes for you to tell them verbally what their offer of proof is." Angelina's attorney told the court: "Continue with the trial and Angelina and I can work on it." The court said: "You'll work on it outside. We'll start with the trial."

The mother's attorney then called the mother to testify. Angelina and her attorney were apparently not present in the courtroom during the mother's testimony. The mother testified about her visits with Bailey, and she testified that Angelina was present during "[a] majority of the visits" between the mother and Bailey in 2009, but she had not been present at most visits since December 2009. The mother explained that, during visits, she had seen Bailey take Angelina's hand and "try to figure out which toys he can go with and which toys she would let him play with." The mother had also observed that, when the mother was busy, Bailey would "go to" Angelina. Bailey looked to both the mother and Angelina as "sources of comfort" and "[d]uring times of stress."

After the mother's testimony, Angelina's attorney returned to the courtroom with a written offer of proof to which none of the other attorneys objected. The court noted that "[s]he [Angelina] didn't want to read it herself," and it asked Angelina's attorney to read the offer of proof, which she did. The offer of proof was entitled "My Thoughts." It read: "I want my brother with me and my mom because what if he's waiting, looking in rooms, expecting us in there, each day, looking, thinking, what happened? Where did they go? Did I do something wrong? And if he is gone, it's like a street with dim lights getting dimmer, darker, quieter. You can see Bailey slowly fading. They're calling him Bailey, Bailey, Bailey. And then he's gone, poof. No more warm memories of his adorable face. No more happy birthdays without him. Might as well call it sad, long, and lonely birthday."

The court asked Angelina's attorney: "[D]id you want to offer anything else in terms of offer of proof or in terms of your client's position other than argument, which I'll let you make some argument." She replied: "No, Your Honor." No other party sought to offer any further evidence. Angelina's attorney was allowed to be the first to argue. She argued that Angelina had "a significant relationship with Bailey" which began when they were placed in the same foster home right after Bailey's birth.[7] Angelina's attorney argued

---

[7] Although she claimed that the two of them had been in the same foster home for "[a] few months," the attorneys for the Department, Bailey, and the foster mother subsequently pointed out that Angelina and Bailey had been in the foster home together for about a month right after Bailey's birth.

that the sibling relationship exception to adoption applied. "Angelina shared significant common experience with Bailey, has an existing and close strong bond with Bailey. And it's up to the court about Bailey's best interest." She said: "I guess I'm confused because I'm not a party so I'm trying not to talk about—" The court reassured her. "You can say anything you want and, you know, they can object. . . . I want you to feel unfettered in making a statement for the child who does have an interest in the outcome. . . . [P]lease go ahead and do speak up because we have to hear you." Angelina's attorney then continued: "Angelina shares a relationship with Bailey. It would affect both Bailey and Angelina if this relationship were severed. And so it is our position that because of the sibling exception . . . the [termination of] parental rights of the mother not occur today." The court asked Angelina's attorney if she had "[a]nything else" and if Angelina "wants to say anything else," and Angelina's attorney said "No, Your Honor."

Both the Department's attorney and Bailey's attorney argued that neither the mother nor Angelina had met the burden of establishing an exception to adoption. Bailey's attorney asserted that adoption was in Bailey's best interest, and she sought termination of parental rights. After all of the attorneys had argued, the court asked Angelina's counsel if she "wish[ed] to add anything to your previous statements." She said "No."

After the court found that the parental relationship exception did not apply, it turned to "Angelina's position." The court concluded: "These facts squarely indicate that the sibling relationship exception does not apply because they're viewed from the eyes of Angelina which is really heartfelt and very moving and touching. She's clearly bonded with him. . . . [B]ut I didn't hear testimony that Bailey recognizes Angelina as his sister. . . . I needed more information, more facts to feel that burden was met." The court explicitly found that "it's in Bailey's best interest to free him for adoption." After the court had stated its findings, it asked the attorneys, including Angelina's attorney, whether they had anything to say. Angelina's attorney said "No, Your Honor."

### 2. Analysis

We see no need in this case to determine whether the juvenile court should have accorded Angelina party status, as the record in this case does not reflect that any error in failing to accord Angelina party status was actually prejudicial to Angelina. "We will not reverse for error unless it appears reasonably probable that, absent the error, the appellant would have obtained a more favorable result." (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876 [7 Cal.Rptr.2d 277].) "The burden is on the appellant in every case affirmatively

to show error and to show further that the error is prejudicial . . . ." (*Vaughn v. Jonas* (1948) 31 Cal.2d 586, 601 [191 P.2d 432].)

In *In re Hector A.* (2005) 125 Cal.App.4th 783 [23 Cal.Rptr.3d 104] (*Hector A.*), the Court of Appeal concluded that the juvenile court had abused its discretion in refusing to allow Hector's siblings to be heard at the section 366.26 hearing in regard to the sibling relationship exception. (*Hector A.*, at p. 798.) The siblings were present at the hearing with counsel, and their statements were given to the court for its consideration. (*Ibid.*) The Court of Appeal found no prejudice because there was no showing that the siblings "had any additional information concerning the sibling relationships that they were precluded from presenting." (*Hector A.*, at pp. 798–799.)

The same is true here. While the juvenile court explicitly declined to accord Angelina party status, the court made every effort to ensure that Angelina and her attorney had a full opportunity to present evidence and argument at the hearing to establish a basis for Angelina's position.

First, the court never even suggested that it would preclude Angelina's attorney from presenting any evidence she wished. Angelina's attorney never indicated at the hearing that she intended to present any evidence other than Angelina's testimony. Angelina chose not to testify, but the court was proactive in ensuring that Angelina's views would be considered through an offer of proof.

Second, although the court expressed uncertainty about whether it was "appropriate" for Angelina's attorney to question witnesses, the court told Angelina's attorney that she could "sit next to" the mother's attorney and have him ask any questions she felt necessary. When the other attorneys declined to question the social worker, the court also offered Angelina's attorney the opportunity to have the social worker questioned by the mother's attorney, and she declined. Since the mother and Angelina had a unified interest in establishing that the sibling relationship exception applied, it was highly improbable that the mother's attorney would have declined to ask a question put forth by Angelina's attorney.[8]

Third, the absence of Angelina and her attorney during the mother's testimony was not at the court's insistence and was not dependent on whether

---

[8] Angelina argues that her lack of party status precluded her trial counsel from objecting to the adequacy of the section 366.26 report. There is no support whatsoever in the record for this contention. Angelina's trial counsel never said or attempted to say anything about the adequacy of the section 366.26 report despite numerous opportunities to comment. Angelina does not contend on appeal that her trial counsel was prejudicially deficient.

Angelina was a party, but was a choice by Angelina's attorney. The court gave Angelina's attorney a choice between "go[ing] outside in your office in the hallway" to work on an offer of proof, or, "[i]*f that doesn't work for you,* I can give everyone ten minutes for you to tell them verbally what their offer of proof is." (Italics added.) Angelina's attorney voluntarily chose to have the hearing continue while she and Angelina worked on an offer of proof "outside." Nor is there any indication in the record that the mother's testimony could have been any more supportive of Angelina's position than it was. The mother testified about Bailey's interactions with Angelina during those visits when Angelina was present. On this record, Angelina has failed to show that more favorable testimony by the mother could have been offered if only she had been accorded party status.

Fourth, since Angelina's offer of proof was accepted without objection, and the court explicitly invited Angelina's attorney to "offer anything else in terms of offer of proof or in terms of your client's position other than argument," the record cannot support a claim that Angelina's lack of party status precluded her from offering additional evidentiary support for her position.

Fifth, the court permitted Angelina's attorney a full and complete opportunity to present argument that was at least equal to the opportunity it gave those accorded party status. The court encouraged Angelina's attorney to "say anything you want" and "to feel unfettered in making a statement" on behalf of Angelina. After Angelina's attorney had completed her argument, the court continued to encourage her by asking if she had "[a]nything else" and if Angelina "wants to say anything else." It was Angelina's attorney who rejected this further opportunity. The court also offered Angelina's attorney a final opportunity to present additional argument after all of the other attorneys had completed their arguments, but Angelina's attorney declined.[9]

In sum, Angelina has failed to carry her burden of showing that the juvenile court's failure to accord Angelina party status, even if erroneous, had any prejudicial impact on Angelina's opportunity to present evidence and argument at the hearing. Consequently, she has failed to establish that the alleged error provides a basis for reversal of the juvenile court's order.

---

[9] Angelina complains that she was "prevented from requesting that the court order posttermination visitation between Bailey and herself." As with her other contentions, this one lacks record support. Angelina's attorney was offered many opportunities to offer evidence, argument, and comments, and she never made the slightest mention of posttermination visitation. Indeed, she was even given an opportunity to comment after the juvenile court had stated its findings. The juvenile court's failure to accord Angelina party status did not preclude Angelina's attorney from commenting on posttermination visitation. Further, it is not the case that Angelina's visits with Bailey were suddenly terminated by the juvenile court's order. She had ceased visiting Bailey several months before the section 366.26 hearing.

### III. Disposition

The order is affirmed.

Bamattre-Manoukian, Acting P. J., and McAdams, J., concurred.